UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Equal Employment Opportunity
Commission,

        Plaintiff,                              Case No. 1:05cv507

        v.                                      Judge Michael R. Barrett

Corporate Security Solutions,

        Defendant.

**OPINION & ORDER**

This matter is before the Court upon Defendant Corporate Security Solutions, Inc.'s ("Corporate Security") Motion for Summary Judgment (Doc. 26). Intervening Plaintiff Jeri Hagemeyer filed a Response in Opposition (Doc. 29), and Corporate Security filed a Reply (Doc. 31) This matter is now ripe for review.

**I.    PROCEDURAL BACKGROUND**

This action was brought before the Court upon a Complaint filed by the Equal Employment Opportunity Commission ("EEOC"). (Doc. 1) On August 8, 2006, this Court granted Intervening Plaintiff, Jeri Hagemeyer's, Motion to Intervene. (Doc. 14) On January 11, 2007, the EEOC and Corporate Security filed a Joint Motion for Approving and Entering a Consent Decree (Doc. 27). The Court granted the Joint Motion, and the Consent Decree was entered on January 12, 2007. (Doc. 28)

**II.    FACTUAL BACKGROUND**

Corporate Security provides security services for local businesses. Hagemeyer originally applied for a position with Corporate Security as a security guard. (Doc. 31-4,

Hagemeyer Depo. at 56)  Hagemeyer was instead hired on November 26, 2003 as a secretary/receptionist in the company's administrative offices. (Doc. 30, Jeri Hagemeyer Affidavit, ¶ 2) Hagemeyer technically reported to Frank Sullivan, the General Manager, but Chris Coppola, the Regional Vice-President, and Matt Yalack, the Personnel Manager, also worked out of that office and sometimes directed her activities.  (Hagemeyer Aff., ¶3) Corporate Security had just acquired American Sentry Protection Service, an existing business, to gain a foothold in the Cincinnati area.  (Doc. 31-2, Christopher Coppola Depo. at 17)  Sherry Harney, who had worked for American Sentry Protective Service for 18 years, and who essentially ran the front office, quit shortly after Hagemeyer's hire. (Hagemeyer Depo. at 64; Coppola Depo. at 36)  Harney did train Hagemeyer for three days before she left, but Harney was unfamiliar with Corporate Security's policies and procedures. (Hagemeyer Depo. at 64)

On several occasions, Sullivan and Coppola told Hagemeyer that she was doing a good job. (Id. at 91-92)  Hagemeyer never received a formal warning or reprimand. (Id. at 72)  Hagemeyer admits that Coppola did, on two occasions, point out mistakes Hagemeyer had made. (Id. at 87)  Soon after she first started, Coppola told Hagemeyer to be more detailed in writing out telephone messages, which she corrected to his satisfaction. (Id. at 87, 88, 89)  On another occasion, Hagemeyer copied an incorrect address from a fingerprint card.  When the materials came back, Hagemeyer and Coppola together looked up the correct address and made the necessary corrections. (Id. at 87)

Coppola has identified several other mistakes Hagemeyer made.  Coppola maintains that Hagemeyer sent out W-2 forms to the security guards in the same envelopes as their paychecks, contrary to his instructions. (Coppola Depo. at 91) Coppola

states that the W-2 forms were sent to the wrong employees and he was forced to drive to the employees' houses, pick up the forms, and deliver the forms to the correct employee. (Id. at 92) Coppola also states that on another occasion, Hagemeyer neglected to give him a message regarding an order for computers that Coppola had promised to a client. (Id. at 81-82) Coppola also points to Hagemeyer's failure to include checks for state licensing fees along with the applications submitted for new employee to the state licensing board. (Id. at 85) Coppola explains that there were other typographical errors made on these applications. (Id. at 87) Corporate Security also maintains that numerous packages were returned to the office due to insufficient postage, and Hagemeyer lost the mail box key. (Id.)

These mistakes were apparently memorialized in three typewritten documents.[1] Coppola has testified that these documents were typed up "[b]ecause we were going to fire her. We wanted documentation of our notes." (Coppola Depo. at 56)

In mid-December 2003, Hagemeyer learned that she was pregnant, and informed Sullivan, Coppola, and Yalacki. Hagemeyer states that they all appeared to be happy for her. (Hagemeyer Aff., ¶ 6; Hagemeyer Depo. at 108-09)

On January 6, 2004, Hagemeyer experienced severe abdominal cramps at work. (Hagemeyer Aff., ¶ 7) During her lunch break, and with Sullivan's permission, Hagemeyer went to a Urgent Care facility. (Hagemeyer Depo. at 100) The nurse told Hagemeyer that she should go to an emergency room. (Hagemeyer Aff., ¶ 7) Because Hagemeyer's lunch

---

[1] Hagemeyer explains that at her deposition counsel for Corporate Solutions produced three typewritten documents relating to her job performance. The first was a document titled "Memo To: File" dated January 21, 2004, and signed by Sullivan. The other two documents, entitled "Performance Issues for Jeri Hagemeyer," and "Notes on Jeri Hagemeyer," both undated, were created by Coppola.

hour was over, she went back to the office and received permission from Coppola and Yalacki to take the rest of the day off.  (Hagemeyer Depo. at 101-102)  At the emergency room, Hagemeyer learned that she was pregnant with twins.  (Id. at 102-103)  Hagemeyer was released that evening, but told to stay off her feet for several days.  (Id. at 103)  That evening, Hagemeyer contacted Coppola on his cell phone and explained what had happened. (Hagemeyer Aff. ¶ 8)  Coppola asked Hagemeyer to bring a doctor's note when she returned the next day, which she did.  (Hagemeyer Depo. at 103)

On January 18, 2004, Hagemeyer developed flu-like symptoms.  (Hagemeyer Aff., ¶ 9)  With the permission of Sullivan and Coppola, Hagemeyer left work to see her doctor. (Hagemeyer Depo. at 110)  Hagemeyer's physician ordered her to take off work for three days.  (Hagemeyer Aff. ¶ 9)  Hagemeyer contacted Coppola, informed him of this development and was told that would be fine.  (Id.)  Hagemeyer then faxed a copy of the doctor's note.  (Id.)

On January 21, 2004, Hagemeyer received a call from Sullivan, who told her that she need not return the next day.  (Hagemeyer Depo. at 18-20)  When Hagemeyer asked Sullivan the reason for her termination, he stated that several problems had arisen. (Hagemeyer Aff., ¶ 10)  When Hagemeyer asked for specifics, Sullivan mentioned the mailing of W-2 forms the "wrong way."  (Hagemeyer Depo. at 111; Hagemeyer Aff., ¶ 10) Hagemeyer then asked Sullivan if she was being terminated because of her pregnancy. (Hagemeyer Aff., ¶ 10)  Hagemeyer states that Sullivan responded: "Partial of it is your pregnancy, yes.  We cannot afford to have someone out of the office at all times, especially with you getting sick, you being pregnant with twins, its going to be a little bit hard."  (Hagemeyer Depo. at 112)

Hagemeyer filed a charge with an EEOC, which led to the filing of the instant action by the EEOC. In Hagemeyer's Complaint in Intervention, Hagemeyer brings claims of discrimination based upon her pregnancy in violation Title VII, as amended by the Pregnancy Discrimination Act, 42 U.S.C. §2000-e(k), and in violation of Ohio law.

### III. ANALYSIS

#### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986). The moving party bears the initial burden of showing the absence of a genuine issue of material fact, but then the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita*, 475 U.S. at 587. However, the nonmoving party may not rest on the mere allegations in the pleadings. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

#### B. Discrimination under Title VII

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Title VII was amended by the Pregnancy Discrimination Act, which provides that:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise.

42 U.S.C. § 2000-e(k).

In a case alleging employment discrimination in violation of Title VII, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or circumstantial evidence from which a jury may infer a discriminatory motive. *Rallins v. Ohio State University*, 191 F.Supp.2d 920, 928 (S.D. Ohio 2002), *citing*, *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348-49 (6th Cir.1997). Hagemeyer claims that there is evidence of both direct and indirect discrimination.

### 1. **Direct evidence of pregnancy discrimination**

Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999); *see also Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) ("[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group."). Generally, direct evidence cannot be based on isolated and ambiguous remarks, but when made by an individual with decision-making authority, such remarks become relevant in determining whether there is enough evidence to establish discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 416 (6th Cir. 2004), *citing*

*Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) ("comments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination"); *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002) (comments by manager lacking any involvement in the decision-making process do not constitute direct evidence); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998) ("isolated discriminatory remark made by one with no managerial authority over the challenged personnel decisions is not considered indicative of [ ] discrimination").

Once the plaintiff has produced credible direct evidence, the burden shifts to the employer to show that it would have taken the employment action of which the plaintiff complains even in the absence of discrimination. *Jacklyn,* 176 F.3d at 926; *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002) (explaining that "an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive.")

As direct evidence of discrimination, Hagemeyer points to Sullivan's statement made on January 21, 2004 during the telephone conversation where he informed her of her termination. Hagemeyer states that Sullivan stated: "Partial of it is your pregnancy, yes. We cannot afford to have someone out of the office at all times, especially with you getting sick, you being pregnant with twins, its going to be a little bit hard." Defendants do not dispute that Sullivan made this statement, but instead argue that the statement by Sullivan cannot constitute direct evidence of discrimination because Cuppola, not Sullivan,

made the decision to terminate Hagemeyer.

Hagemeyer relies on Coppola's deposition testimony to prove that Sullivan had direct input in the decision to terminate her employment:

> Q. So you and Mr. Sullivan talked about the termination and both of you decided to type up notes?
>
> A. We had talked about the problems we were having with her, and at that point, you know, I had notes scattered, you know. They weren't specific notes so we decided at that point we would make, put all our, combine our notes on to one -- he would combine his notes, I would combine my notes . . .

(Coppola Depo. at 57)  The Court finds that this testimony is sufficient to create a genuine issue of material fact as to whether Sullivan was involved in the decision to terminate Hagemeyer.  Therefore, Hagemeyer has produced credible direct evidence that her pregnancy was a motivating factor in the decision to terminate her employment.

Accordingly, the burden shifts to Corporate Security to prove by a preponderance of the evidence that it would have made the same decision to terminate Hagemeyer's employment absent the impermissible motive.  In addressing this burden, Corporate Security has cited to the following passage from Copolla's deposition testimony:

> And we can cut right to the chase here, if you want to ask me straight out if her pregnancy had any reason to do with her firing, I will tell you it absolutely did not. . . . I thought she did a horrible job, and that was what my issues were. They really weren't with her pregnancy. To be honest with you, when I heard that that was what the issue was with her, her conflict with her termination, I really couldn't believe it. I really couldn't believe it. Because at no time did I ever make her feel that her being pregnant had anything to do with the problem that I had with her performance. And, you know, just flat out that's the way it was. I mean, I really didn't - it really didn't even occur to me that - you know, it didn't mean anything to me that she was pregnant or not pregnant. She could have been pregnant or not been pregnant, it wouldn't have made a difference. The issues I had with her was her performance, the fact that she wasn't doing the job that I needed to have done.

(Coppola Depo. at 99-100) However, the Court finds that there is a genuine issue of material fact regarding whether Hagemeyer's job performance alone was a sufficient basis for her termination. Coppola testified that on previous occasions he has sat down face-to-face with the employees and explained to employees why they are being terminated and what the problems are with their performance. (Id. at 101) Coppola explained that he then gives the employees an opportunity to talk to him. (Id.) Coppola stated that often he gave the employee a second or third chance. (Id.) Hagemeyer was not afforded such an opportunity. (Id.) Therefore, the Court finds that Hagemeyer has established a *prima facie* case of discrimination based on pregnancy through the use of direct evidence. Accordingly, Corporate Security is not entitled to summary judgment.

### 2. Indirect evidence of pregnancy discrimination

The Court also finds that Hagemeyer has presented sufficient indirect evidence to support her claim of pregnancy.

Where a plaintiff relies on indirect evidence of discrimination, a claim of employment discrimination is to be analyzed using the burden-shifting approach first announced in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). A plaintiff has the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. *Id.* at 802.

To establish a *prima facie* case of pregnancy discrimination, the plaintiff must show that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000). If the plaintiff succeeds in establishing a *prima facie* case, an inference of

discrimination arises, and the burden then shifts to the defendant to articulate some legitimate nondiscriminatory reason for its actions. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981). If the defendant articulates a nondiscriminatory reason for its actions, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons put forth by the defendant were not its true reasons but were a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802. The plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the adverse action, or (3) the proffered reason was insufficient to motivate the adverse action. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The ultimate burden of persuading the trier of fact that the employer intentionally discriminated against her remains at all times with the plaintiff. *Burdine*, 450 U.S. at 253.

Corporate Security argues that Hagemeyer cannot make out a *prima facie* case of discrimination because Hagemeyer was not qualified for her job. Corporate Security points to Hagemeyer's work history, which consists of only one experience as an administrative assistant for a five-month period. Hagemeyer counters that her work history is not relevant because it was known to Coppola when he hired Hagemeyer. The Court agrees. This is not a case involving a failure to promote. Hagemeyer was hired on November 26, 2003 for the very job that she was fired from on January 21, 2004. Without any evidence to the contrary, the Court must conclude that Hagemeyer was qualified for the position.

Next, Corporate Security argues that Hagemeyer cannot show that there is a nexus between her pregnancy and the adverse employment decision. Hagemeyer counters that she has established a causal connection based upon temporal proximity. The Court

agrees. Temporal proximity can satisfy the nexus requirement in the pregnancy discrimination context. *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006). Here, Hagemeyer told Sullivan, Coppola, and Yalacki in mid-December 2003 that she was pregnant. Hagemeyer was terminated approximately one month later on January 21, 2004. This temporal proximity is sufficient to establish a link between Hagemeyer's pregnancy and her termination for the purposes of a *prima facie* case. *Id.* (two months), citing *DiCarlo*, 358 F.3d at 422 (twenty-one days); *DeBoer v. Musashi Auto Parts, Inc.*, 2005 WL 434526, *3 (6th Cir. 2005) (unpublished) (approximately two months).

Therefore, the Court concludes that Hagemeyer has established a *prima facie* case of pregnancy discrimination.

Corporate Security has articulated a legitimate nondiscriminatory reason for terminating Hagemeyer's employment. Corporate Security maintains that Hagemeyer was incompetent and was unable to be trained to properly perform the job of secretary/receptionist. Corporate Security cites to the numerous mistakes made by Hagemeyer. Hagemeyer disputes the factual basis of Corporate Security's proffered reason for her termination, or argues that the proffered reason did not actually motivate the decision to terminate her.

Regarding the licensing applications, Hagemeyer explains that the forms were completed by the applicant themselves, and then reviewed by Sullivan or Coppola before being mailed out. (Hagemeyer Depo. at 129) Hagemeyer states that her role was only to make any changes requested by Sullivan or Coppola, place the applications in an envelope, and then mail the applications. (Id.) Hagemeyer argues that she had no control over the content of the applications.

Next, regarding incidents of incorrect postage, Hagemeyer states that she was never informed of any mailings returned for insufficient postage. (Id. at 127) Moreover, Hagemeyer states that she was never shown how to read the postal chart, and had to ask the mailman to explain the chart to her. (Id. at 81)

Regarding the mailing of the W-2 forms, Hagemeyer explains that the W-2 forms were computer-generated by payroll and presented to the administrative office in a sealed envelope with a pre-printed address. (Id. at 112) Hagemeyer states that her only responsibility was to mail the forms. (Id.) Hagemeyer also maintains that W-2 Forms were mailed separately, not stuffed into the envelopes with the paychecks. (Id. at 131)

Regarding the mailbox key, Hagemeyer explains that one night she accidentally took the key. (Id. at 133) Hagemeyer states that later that evening Yalacki contacted her on her cellphone. (Id.) Realizing her mistake, Hagemeyer arranged to meet Yalacki and gave him the key. (Id.)

Regarding the checks for licensing applications, Hagemeyer maintains that the only application which was returned was one she mistakenly sent to an old address. (Id. at 127)

Regarding the telephone messages, Hagemeyer admits that Coppola talked to her during her first or second week about writing more detailed messages. (Id. at 135) However, Hagemeyer explains that after that one conversation, no one ever complained about those telephone messages. (Id.)

Finally, regarding the personnel files, Hagemeyer admits that she was in charge of creating each file, but was forced to write and whiteout the labels because she did not have a typewriter or computer. (Id. at 163) Hagemeyer states that she was given permission to handwrite the labels from Coppola. (Id.)

Based on the foregoing, the Court finds that Hagemeyer has carried her burden of showing that the legitimate reasons put forth by Corporate Security were not its true reasons for her termination, but were a mere pretext for discrimination. Therefore, the Court finds that Corporate Security is not entitled to summary judgment on Hagemeyer's claim of pregnancy discrimination.

### C. Discrimination under Ohio law

The Ohio Supreme Court has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964 is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981); *see also Tysinger v. Police Dept. of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006) ("The federal and state pregnancy discrimination claims are evaluated generally under the same substantive standards."). Therefore, the above analysis applies to Hagemeyer's state law claims, and Corporate Security is not entitled to summary judgment on this claim.

### IV. CONCLUSION

Based on the foregoing, the Court **DENIES** Defendant Corporate Security Solutions, Inc.'s Motion for Summary Judgment (Doc. 26).

**IT IS SO ORDERED.**

                                       */s/ Michael R. Barrett*
                                       Michael R. Barrett, Judge
                                       United States District Court